In re David Sampson KEACH, Debtor.

David Sampson Keach, Appellant,

v.

John Boyajian, Chapter 13
Trustee, Appellee.

BAP No. RI99–055.

United States Bankruptcy Appellate Panel
of the First Circuit.

Jan. 27, 2000.

Peter G. Berman, Raskin & Berman, Providence, RI, on brief, for Appellant.

John Boyajian and Boyajian, Harrington & Richardson, Providence, RI, on brief, for Appellee.

Before: QUEENAN, HAINES, and BOROFF, Bankruptcy Judges.

QUEENAN, Bankruptcy Judge.

A debtor files under Chapter 7, is unsuccessful in an attempt to convince the court that his largest creditor holds a contract claim rather than a nondischargeable fraud claim, and also fails in his efforts to convert the case to Chapter 13. He then files under Chapter 13 to obtain the broader discharge available there for fraud claims. This second filing occurs after his general Chapter 7 discharge enters but while the prior case remains open. In his Chapter 13 plan the debtor proposes to devote all his disposable income to paying priority tax debt in full and a 5% dividend on the fraud claim. Has he proposed the plan in bad faith because of the 5% dividend and the occurrence of one or more of these prior events? That is the question here. It is one which has caused a split among circuits and is unresolved in this circuit. We hold none of these facts is indicative of

bad faith. Because the bankruptcy court thought otherwise and denied confirmation, we vacate the court's order and remand.

## I. FACTUAL BACKGROUND

The bankruptcy court's findings and the record disclose the following. David Sampson Keach (the "Debtor") operates a home construction business as a sole proprietor. In 1989 he entered into an agreement with Claire L. Kuzniar ("Kuzniar") to remodel her summer cottage and convert it into a year round residence. Before the project was completed, Kuzniar complained of defects in the home's construction and design. She insisted upon their correction. When the parties could not agree, the Debtor walked off the job after having been paid $70,000.

Kuzniar sued in state court under counts for breach of contract and unfair and deceptive trade practices. In the subsequent jury trial the judge instructed the jury it could find the Debtor liable for unfair and deceptive trade practices if it found he had misrepresented his level of expertise and had effectuated a "bait and switch" with respect to the parties' written contract. The jury returned a verdict for Kuzniar on both counts. It awarded aggregate compensatory damages of $76,000 under both counts, and punitive damages of $30,000 under the count for unfair and deceptive trade practices. Judgment entered.

A month later the Debtor and his wife filed a Chapter 7 petition without appealing the judgment. Kuzniar countered by filing an adversary proceeding in the bankruptcy court requesting judgment declaring her debt nondischargeable as a debt for "false pretenses, a false representation, or actual fraud" within the meaning of section 523(a)(2) of the Code. She then filed a motion for summary judgment, urging the court to apply principles of issue preclusion based on the state court trial. Rejecting the Debtor's contention that issue preclusion should not apply because the jury had not found the required scienter, the bankruptcy court granted the motion. *See In re Keach*, 204 B.R. 851 (Bankr.D.R.I.1996). The Debtor took no appeal. He instead gave notice of conversion of the case to Chapter 13. On Kuzniar's motion, the court entered an order striking the notice to convert on the ground the amount of the Debtor's liabilities at the filing date made him ineligible for Chapter 13. The Debtor unsuccessfully attempted to appeal.[1] His discharge soon entered, discharging him of all debt except the Kuzniar debt and certain federal income tax debt.[2]

The Debtor's attempted appeal of the order denying conversion consumed about a year from the time the court declared the Kuzniar debt nondischargeable. Kuzniar, understandably, declined to wait. She obtained a judgment lien upon the Debtor's home and scheduled a sheriff's sale of the property. On February 11, 1998, shortly before the scheduled sales date, the Debtor commenced the present Chapter 13 case, thereby imposing an automatic stay of the sale. The prior Chapter 7 case had at that time not yet been closed, apparently because of the Debtor's appellate efforts. His Chapter 13 schedules listed the Internal Revenue Service as an unsecured priority claimant in the sum of $28,596 for income taxes owed for 1993 through 1997. Total unsecured debt was scheduled at $188,813, of which $180,000 was the Kuzniar claim, which had grown with interest.[3]

---

1. The appeal was initially unperfected, which resulted in a dismissal. A later attempt to appeal was withdrawn.

2. *See* 11 U.S.C.A. § 523(a)(1) (Law.Coop.1997).

3. The other claims listed were municipal excise tax claims and federal income tax debt. The schedules listed none of the claims discharged in the prior Chapter 7, including two small claims secured by judicial liens on the Debtor's home.

The Debtor's initial Chapter 13 plan, filed on March 5, 1998, proposed to pay the priority federal income taxes in full, through monthly payments of $700, and to make a $13,000 lump sum payment on all other claims.[4] On September 22, 1998, the court denied confirmation because it believed the plan was not feasible and was not proposed in good faith. *See In re Keach*, 225 B.R. 264 (Bankr.D.R.I.1998). The Debtor then filed an amended plan reflecting an upward adjustment on priority tax debt to $35,769, which was to be paid in full through 60 monthly payments of $600. The amended plan proposed paying nonpriority unsecured debt, including the Kuzniar claim, by a $10,000 payment to the Chapter 13 trustee within three days after confirmation.[5] Kuzniar objected to the amended plan, contending it was not proposed in good faith. The Chapter 13 trustee objected on grounds of lack of good faith and lack of feasibility. At the evidentiary confirmation hearing the trustee withdrew his objection as to feasibility.[6] No party contended the Debtor was not devoting all his projected three year disposable income to plan payments. The court again denied confirmation, this time solely on the ground the plan was not proposed in good faith.

## II. BANKRUPTCY COURT'S DECISION

In denying confirmation on bad faith grounds the bankruptcy court in both its decisions considered eleven nonexclusive factors which, as we shall see, a number of courts have employed to test good faith.[7] In its first decision, which the court incorporated into its second, the court emphasized six factors it thought indicative of bad faith:

1. The filing of the Chapter 13 petition before the Chapter 7 case having been closed.

2. The "nominal" dividend.

3. The Debtor's misrepresentation (apparently through counsel) that two judicial liens on his home had been avoided in the Chapter 7 case.

4. The absence of any change in the Debtor's circumstances between the Chapter 7 and Chapter 13 filings.

4. The Chapter 13 trustee's fees were to come from both of these payments.

5. The amended plan also indicated that $3,500 had been paid to the Chapter 13 trustee prior to the plan's filing, through monthly payments under the prior plan, which the Debtor wished to be applied toward the trustee's fee. Both the initial and amended plan proposed direct monthly payments to the two holders of mortgages on the Debtor's home.

6. The Debtor had in the meantime filed amended schedules I and J concerning expenses and income. Although the record does not contain these amended schedules, the transcript of the confirmation hearing indicates income was increased, primarily through earnings of the Debtor's wife who had previously not worked outside the home. The source of the $10,000 lump sum payment was a loan from a friend of the Debtor which the friend had committed conditional on confirmation. He required the Debtor to make no payment on this loan until completion of plan payments.

7. The bankruptcy court considered the following eleven factors: 1. The proximity in time of the Chapter 13 filing to the Chapter 7 filing. 2. The percentage of proposed repayment. 3. The debtor's past bankruptcy filings. 4. The debtor's honesty in representing facts. 5. Any unusual or exceptional problems facing the debtor. 6. The nature and amount of unsecured claims. 7. Whether a major portion of the claims sought to be discharged arises out of pre-petition fraud or other wrongful conduct and the debtor proposes only minimal repayment of those claims. 8. Whether, despite the most egregious pre-filing conduct, the plan represents a good faith effort to satisfy creditors' claims. 9. Whether the debtor has incurred some change in circumstances between the filings that suggests a second filing was appropriate and that the debtor will be able to comply with the terms of a Chapter 13 plan. 10. Whether the two filings accomplish a result that is not permitted in either Chapter standing alone. 11. Whether the two filings are an attempt to manipulate the bankruptcy system or are an abuse of the purpose and spirit of the Bankruptcy Code.

5. The bulk of the debt being nondischargeable.

6. The Debtor seeking to accomplish in the Chapter 7 and Chapter 13 cases together a result that would not be possible in either alone.

The court particularly focused on the second and fifth factors, stating: "Under his plan, Keach will pay his $35,000 priority tax debt, and the mortgage on his $250,000 house, but will pay virtually nothing to the defrauded creditor, Claire Kuzniar, whose claim exceeds $180,000."[8] The court also expressed displeasure with the Debtor's testimony, saying: "[H]e defers to his accountant and his wife, and we do not have an adequate picture of what is fact and what is fiction when it comes to the Debtor's budget."[9] In criticizing the Debtor's testimony the court did not find the Debtor had misrepresented facts concerning his budget, only that he could not provide these facts.

In summary, prescinding from this testimony and reducing the decision to its essential elements, the bankruptcy court had three grounds for its conclusion that the plan was not proposed in good faith: (1) the nondischargeability of the Kuzniar debt in Chapter 7, (2) the 5% dividend paid on it, and (3) the filing of successive Chapter 7 and Chapter 13 petitions. The Debtor contends these matters are not indicia of bad faith.

## III. MEANING OF REQUIREMENT OF "GOOD FAITH" PLAN PROPOSAL

Section 1325 of the Code contains the requirements for confirmation of a chapter 13 plan.[10] Among them is this seemingly innocuous condition:

> (6) the debtor will be able to make all payments under the plan and to comply with the plan.
>
> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.
>
> (2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3) to a qualified religious or charitable entity or organization) (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.
>
> (c) After confirmation of a plan, the court may order any entity from whom the debtor

8. Decision of March 16, 1999, p. 4.

9. *Id.*

10. Section 1325 provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
>
> (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
>
> (3) the plan has been proposed in good faith and not by any means forbidden by law;
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
>
> (5) with respect to each allowed secured claim provided for by the plan—
>
> (A) the holder of such claim has accepted the plan;
>
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
>
> (C) the debtor surrenders the property securing such claim to such holder; and

the plan has been proposed in good faith and not by any means forbidden by law. . . .

11 U.S.C.A. § 1325(a)(3) (Law.Co-op.1987).

In the absence of contrary evidence, and there is no relevant legislative history, Congress presumably used the phrase "good faith" in its ordinary sense. Webster says it means "a state of mind indicating honesty and lawfulness of purpose." [11] Black offers this definition: "Good faith is an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage, and an individual's personal good faith is concept [sic] of his own mind and inner spirit and, therefore, may not conclusively be determined by his protestations alone. . . ." [12] Black notwithstanding, there is one statutory definition which has broad commercial application. The Uniform Commercial Code defines good faith as "honesty in fact in the conduct or transaction concerned." [13]

### Decisions under Prior Act

That the good faith mandate of section 1325 imposes a standard of simple honesty is confirmed by decisions under the prior Bankruptcy Act. The prior Act contained a similar requirement of good faith in the proposal of a plan under its Chapter XIII.[14] There is no reported case law construing this good faith confirmation requirement.[15] But many decisions applied the Act's mandate of good faith plan proposal which was contained in other chapters.[16] In all these decisions the courts

receives income to pay all or any part of such income to the trustee.
11 U.S.C.A. § 1325 (Law. Co-op.1987 & Supp.1999).

11. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 978 (Merriam–Webster Inc. 1986).

12. BLACK'S LAW DICTIONARY 623 (5th ed.1979).

13. U.C.C. § 1–201(19). In a sales transaction involving a merchant, the Uniform Commercial Code contains a definition of good faith having both subjective and objective elements: "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." U.C.C. § 2–103(b).

14. See 11 U.S.C. § 1056(a)(4) (repealed 1978) (requiring court to be satisfied that "the proposal and its acceptance are in good faith and have not been made or procured by any means, promises or acts forbidden by this Act.") See also 11 U.S.C. § 1051 (repealed 1978) (containing same confirmation requirement).

15. See 8 LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY ¶ 1325.LH[1][a] at 1325–62.3 (15th ed. rev.1999).

16. See, e.g., American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 144–45, 61 S.Ct. 157, 85 L.Ed. 91 (1940) (when city's agent for solicitation of acceptances of its Chapter IX plan purchased claims on his own account without disclosure of this dual capacity, and then voted those claims in acceptance of plan, conduct deemed not in good faith); Gonzalez Hernandez v. Borgos, 343 F.2d 802, 805–06 (1st Cir.1965) (Chapter XII plan not proposed in good faith if plan is vehicle to place debtor's assets beyond reach of his dependent children); Texas Hotel Sec. Corp. v. Waco Dev. Co., 87 F.2d 395, 399–400 (5th Cir.1936), cert. denied, 300 U.S. 679, 57 S.Ct. 671, 81 L.Ed. 883 (1937) (no bad faith in voting of purchased claims in rejection of plan in order to advance business interest of claim purchaser to acquire lease rights in debtor's hotel); In re Norman Fin. & Thrift Corp., 298 F.Supp. 336, 338 (W.D.Okla.1969) (finding no evidence that acceptances of Chapter XI plan "were obtained by fraudulent or other means violative of the provisions, purpose or spirit of Chapter XI"); In re Stanley Karman, Inc., 279 F.Supp. 828 (S.D.N.Y. 1967) (no good faith in proposal of plan by Chapter XI debtor in possession in light of debtor's postpetition failure to take action to enhance estate such as setting aside debtor's prepetition fraudulent transfers); In re Village Men's Shops, Inc., 186 F.Supp. 125, 129 (S.D.Ind.1960) (declining to find bad faith in conduct of parties soliciting and accepting plan and observing that "specific inquiry should be whether, under the circumstances of the case, there has been an abuse of the provision, purpose, or spirit of the chapter in the proposal and acceptance of the arrangement [under Chapter XI]," citing ¶ 9.20 of the 14th edition of Collier containing same language); In re Morris, 246 F. 1021 (D.Mass. 1917) (composition not proposed by debtor in good faith where value of assets far exceeded amount offered creditors and debtor misled

used the phrase in its ordinary sense of honesty. Occasionally, a party would try to expand its meaning by alleging there was a lack of good faith when a debtor asserted rights under bankruptcy law. In *In re Koch*,[17] for example, the debtor was accused of bad faith in filing a chapter XI petition for the purpose of terminating the administration of her property by an existing state court receiver. The court flatly rejected this contention, stating "the debtor has a legal right to have her property administered in bankruptcy."[18]

It was well established under the Act, therefore, that the mandate of good faith plan proposal required only honesty in the debtor's conduct related to the plan or the case. Good faith had nothing to do with the debtor's prepetition actions or the debtor's assertion of legal rights.[19]

Collier agrees that the concept of good faith had this limited meaning under the Act.[20] But the fourteenth edition of Collier, published while the Act was in effect, used broad language to describe the Act case law, stating: "Good faith itself is not defined but generally the inquiry is directed to whether or not there has been an abuse of the provisions, purposes, or spirit of Chapter XIII in the proposal or plan."[21] As we shall see, this vague statement has been a source of misdirection in the Code's case law.

## Discharge Provisions of the Code

Since its enactment in 1978, the Bankruptcy Code has contained provisions on discharge under Chapter 7 and Chapter 13 which are quite different. No discharge is available in Chapter 7 for certain tax and student loan debt, or debts resulting from fraud, embezzlement, larceny, breach of fiduciary duty or willful and malicious injury to person or property.[22] Except for student loan debt as the result of a recent amendment, all such debt may be discharged in Chapter 13.[23] There is, however, a *quid pro quo* for the expanded discharge available under Chapter 13. The debtor must devote all his projected disposable income for three years to the plan's payments.[24] The difference between the discharge provisions of the two chapters lies at the heart of the problem here.

## Pre–1984 Code Case Law on Nominal Payments or Debt Nondischargeable in Chapter 7

Decisions under the Code have dealt with all of the three essential factors that were persuasive to the bankruptcy court here—nondischargeability of debt in Chapter 7, a small dividend and successive filings. Much of the Code case law is confounding, conflicting and disingenuous. And, having started in the wrong direction,

---

creditors by placing low value on assets in bankruptcy schedules).

17. 116 F.2d 243 (2d Cir.1940), *cert. denied*, 313 U.S. 565, 61 S.Ct. 941, 85 L.Ed. 1524 (1941).

18. *Id.* at 246.

19. *Matter of Nathanson*, 50 Am.B.R. 465, 471 (1941) ("good faith has to do with the proposal of the arrangement and its acceptance and ... [that] the matter of the conduct of the debtor, prior to the commencement of these proceedings, is not involved.").

20. *See* 9 James Wm. Moore, Collier on Bankruptcy ¶ 9.20 n. 8 (14th ed.1978); *See also* 8 Lawrence P. King, Collier on Bankruptcy ¶ 1325LH[a] (15th ed. rev.1999) ("In general, cases finding a lack of good faith under the

Bankruptcy Act involved debtor misconduct, such as fraudulent misrepresentations or serious nondisclosures of material facts" [footnotes omitted] ).

21. 10 James Wm. Moore, Collier on Bankruptcy ¶ 29.06[6], at 339 (14th ed.1978).

22. *See* 11 U.S.C.A. § 523(a) (Law. Co-op.1997 & Supp.1999).

23. *See* 11 U.S.C.A. § 1328 (Law. Co-op.1987 & Supp.1999). Debts for alimony or child support, and certain other debts, are not dischargeable in either chapter. *See* 11 U.S.C.A. §§ 523(a), 1328(a) (Law. Co-op.1987 & Supp. 1999).

24. *See* 11 U.S.C.A. § 1325(b) (Law. Co-op.1987 & Supp.1999).

it gives insufficient recognition to the effect of two 1984 amendments. With apologies to Thoreau, who admired brevity,[25] these decisions require extensive analysis.

As originally enacted, the Code's only financial requirement for confirmation was that the plan be in the "best interests" of creditors, that is, that it provide creditors with at least what they would get in a Chapter 7 liquidation.[26] There was no mandate that the debtor devote all his projected three year disposable income to plan payments.[27]

When a debtor's plan provided for a zero or nominal dividend, creditors in the early years of the Code contended the proposal was not made in good faith. In *Barnes v. Whelan (In re Barnes)*,[28] the debtor proposed full payment of debts she had cosigned with others and a 1% dividend on other debt. The court saw no lack of good faith. It observed that case law under the Act employed the phrase in its ordinary sense of honesty. The court found nothing in the wording of the Code or its legislative history indicating that section 1325 uses good faith in anything other than this ordinary and historic meaning. It concluded that requiring a certain level of repayment would impose a definition of good faith at odds with the phrase's meaning when Congress enacted section 1325(a)(3).[29]

Most other circuits took a different view of zero or nominal payment plans. The first of these decisions at the appeals court level was *Tenney v. Terry (In re Terry)*.[30] The debtors, whose monthly expenses exceeded their income and who had no secured debt, proposed to pay nothing to their unsecured creditors. Relying on the Collier passage previously referred to and ignoring the Act case law, the court held the plan was an abuse of the "spirit" of Chapter 13 and hence filed in bad faith.

In *Goeb v. Heid (In re Goeb)*,[31] the debtors proposed to pay their secured and priority creditors in full and to pay 1% to unsecured creditors, which was all they could afford. The lower courts thought this was not in good faith. Labeling "good faith" an ambiguous term, the court of appeals found guidance in *American United Mutual Insurance Co.*,[32] where the Supreme Court ruled a plan was not proposed in good faith when a city's agent for soliciting acceptances of its chapter IX plan had purchased claims for his own account without disclosure of this dual capacity. In holding the solicitation was not conducted in good faith, the Supreme Court spoke of "equity and good conscience," a phrase which the *Goeb* court thought instructive. The *Goeb* court also looked to the Collier passage directing an inquiry into "whether or not there has been an abuse of the provision, purpose, or spirit of chapter XIII in the proposal or plan." It fashioned from all this the following standard: "A bankruptcy court must inquire whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner."[33] The bankruptcy court's finding of bad faith had been based solely on the absence of substantial payment to unsecured, nonpriority creditors. In a preview of decisions to come, the court of appeals believed all "militating factors" should be taken into account in

25. In a letter to a friend, Thoreau said: "Not that the story need be long, but it will take a long time to make it short." THE OXFORD DICTIONARY OF QUOTATIONS 550:26 (3d ed.1979).

26. *See* Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 stat. 2549 (1978) (§ 1325(4)).

27. *See id.*

28. 689 F.2d 193 (D.C.Cir.1982).

29. *See id.* at 199.

30. 630 F.2d 634 (8th Cir.1980).

31. 675 F.2d 1386 (9th Cir.1982).

32. 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91.

33. 675 F.2d at 1390.

the inquiry including, in the case before it, the debtor having no surplus in income after plan payments.[34] It remanded the case to the bankruptcy court for a consideration of all such factors.

*Deans v. O'Donnell (In re Deans),*[35] another zero payment case, came next. The lower courts had ruled the plan was not proposed in good faith solely because of its zero payment feature. The Fourth Circuit reversed and remanded, saying the proper inquiry should be into the "totality of the circumstances," including not only the plan's zero payment feature but also such factors as "the debtor's financial condition, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor."[36]

*Ravenot v. Rimgale (In re Rimgale)*[37] was another early court of appeals decision, the first to involve debt which is nondischargeable in Chapter 7. The debtor there proposed a 36 month plan paying 11% on unsecured debt, which included tort debt probably nondischargeable in Chapter 7 because it resulted from fraud or breach of fiduciary duty. The lower courts confirmed the plan. The Seventh Circuit reversed and remanded. Although nondischargeability of the debt in Chapter 7 was clearly what most influenced the court, it phrased the considerations to be taken into account in this manner: "(1) Does the proposed plan state [the Debtor's] secured and unsecured debt accurately? (2) Does it state the debtor's expenses accurately? (3) Is the percentage of repayment of unsecured claims correct? (4) If there are or have been deficiencies in the plan, do the inaccuracies amount to an

attempt to mislead the bankruptcy court? (5) Do the proposed payments indicate a fundamental fairness in dealing with one's creditors?"[38] The court elaborated on what it meant by "fundamental fairness," saying the bankruptcy court should "examine the timing of the bankruptcy filings, the proportion of the total unsecured debt that is represented by the [state court] judgment, and the equities of classifying together ordinary consumer debt and a judgment debt arising out of intentionally tortious conduct."[39]

*United States v. Estus (In re Estus),*[40] also decided in 1982, involved both a zero payment plan and the proposed discharge of student loan debt nondischargeable in Chapter 7. The lower courts found good faith in the plan proposal and confirmed the plan. The United States, as holder of the student loan debt, appealed. The Eighth Circuit looked to a long list of factors which has since been adopted by a number of other courts. It believed a good faith inquiry should consider the following factors, in addition to the percentage of the proposed payment:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

---

34. *See id.* at 1390–1391.

35. 692 F.2d 968 (4th Cir.1982)

36. *Id.* at 972.

37. 669 F.2d 426 (7th Cir.1982).

38. *Id.* at 432–33 [footnotes omitted].

39. *Id.* at 433 n. 22.

40. 695 F.2d 311 (8th Cir.1982).

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.[41]

*Estus* is the first court of appeals decision to expressly include as an indicator of bad faith a debt's nondischargeability in Chapter 7, which was relevant to the facts before it, and the existence of multiple filings, which was not. The court concluded by stating a "cursory examination of several factors of the plan in the instant case reveals an apparent lack of good faith."[42] The several factors were: (1) the 15 month duration of the plan, (2) the discharge of a debt not dischargeable in chapter 7, and (3) the plan ignoring future income increases that the debtor, a federal employee, would likely receive.[43] Declining, however, to make a *de novo* determination on the good faith issue, the court reversed and remanded. There were similar court of appeals decisions under the pre–1984 version of section 1325.[44] They employed either the *Estus* factors or its equivalent the "totality of the circumstances," as the standard.

An early critic of this reasoning emerged in the person of Conrad K. Cyr, then a bankruptcy judge for the District of Maine and now a senior judge on the Court of Appeals of the First Circuit.[45] Pointing out that the best interests test imposed the only (at that time) minimum dividend requirement, Judge Cyr could see no basis for courts creating another minimum requirement out of whole cloth.[46] He believed the established historical meaning of good faith gives no indication Congress intended the phrase to play a critical role in determining a plan's minimal permissible dividend.[47] He was equally harsh on decisions which held, despite the broad discharge available under section 1328(a), that a proposal to discharge debt nondischargeable in Chapter 7 is an indicator of

41. *Id.* at 317.

42. *Id.*

43. *See id.*

44. *See, e.g., Gier v. Farmers State Bank (In re Gier),* 986 F.2d 1326 (10th Cir.1993) (no error in bankruptcy court finding bad faith plan proposal under *Estus* factors where debtor failed to discharge section 523(a)(6) debt in Chapter 7 and attempted to discharge same debt in Chapter 13); *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030 (6th Cir.1988) (dealing with debt resulting from "questionable conduct" of debtor in not recording creditor's lien and permitting finding of bad faith based not on this conduct alone but on "totality of circumstances" including a prior bankruptcy filing); *In re Chaffin,* 816 F.2d 1070 (5th Cir.1987), vacated, 836 F.2d 215 (5th Cir.1988) (payment of 2% dividend debt resulting from nondischargeable fraud warrants finding of bad faith when considered in conjunction with other factors under standard of "totality of circumstances"); *Public Fin. Corp. v. Freeman,* 712 F.2d 219 (5th Cir.1983) (affirming finding of good faith in proposal of zero payment to unsecured creditors under standard of "totality of circumstances"); *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir.1983) (remanding under *Estus* factors because in denying confirmation bankruptcy court had placed emphasis on minimal payment feature of debtor's 3% plan); *Kitchens v. Georgia R.R. Bank & Trust Co. (In re Kitchens),* 702 F.2d 885 (11th Cir.1983) (remanding under *Estus* factors question of confirmation of 10% plan in view of record's indication of debtors' underestimation of income and overestimation of expenses).

45. *See* Conrad K. Cyr, *The Chapter 13 "Good Faith" Tempest: An Analysis and Proposal for Change,* 55 Am.Bankr.L.J. 271 (1981).

46. *See id.* at 274.

47. *See id.* at 275–77.

bad faith.[48] Judge Cyr endorsed the proposal of the National Bankruptcy Conference to amend section 1325 by adding a provision requiring the debtor to commit projected three year disposable income to plan payments.

### 1984 Amendment on Disposable Income

Due largely to efforts of Judge Cyr and the National Bankruptcy Conference, Congress in 1984 inserted subsections 1325(b)(1)(B) and 1325(b)(2).[49] Section 1325(b)(1)(B) now states that upon an objection being made to confirmation the plan shall not be confirmed unless it "provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." [50]

After a later amendment concerning charitable contributions, disposable income is now defined as follows:

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended

(A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.[51]

### Post–1984 Case Law on Nominal Payments and Debt Nondischargeable in Chapter 7

Since enactment of the 1984 amendment, some courts have recognized that a low level of payment can no longer be used as an indicator of bad faith. In *Education Assistance Corp. v. Zellner*,[52] for example, the court had this to say about present section 1325: "This section's 'ability to pay' criteria subsumes most of the *Estus* factors and allows the court to confirm a plan in which the debtor uses all of his disposable income for three years to make payments to his creditors." [53]

But many post–1984 decisions, particularly those involving debt nondischargeable in Chapter 7, continue to list all the *Estus* factors, or a similar standard, with no apparent recognition that matters relating to income, expenses and level of payments are now dealt with by express Code language. In *Neufeld v. Freeman*[54] the debtor, an art and antique dealer, had sold articles consigned to her for sale and had pocketed the proceeds. She initially filed under Chapter 7, but then converted the case to Chapter 13 after one of her consignors filed a complaint seeking to have his debt declared nondischargeable as debt resulting from willful and malicious injury to property. The debtor's Chapter 13 plan proposed to pay about 30% of all unsecured debt. The lower courts rejected the contention of the creditor-consignor that the nondischargeability of his debt in Chapter 7, together with the debtor's discharge in an old Chapter 13 proceeding, indicated the plan was not proposed in

---

48. *See id.* at 278.

49. Bankruptcy Amendments & Federal Judgeship Act of 1984, Pub.L. No. 98–353, 99 stat. 333 (codified as amended in scattered sections of 11 U.S.C. and 28 U.S.C.).

50. 11 U.S.C.S. § 1325(b)(1)(B) (Law. Co-op.1987 & Supp.1999).

51. 11 U.S.C.S. § 1325(b)(2) (Law. Co-op.1987 & Supp.1999).

52. 827 F.2d 1222 (8th Cir.1987).

53. *Id.* at 1227.

54. 794 F.2d 149 (4th Cir.1986).

good faith. The Fourth Circuit reversed and remanded because the lower courts had "declined to consider" nondischargeability of the debt in Chapter 7 and the debtor's prior discharge under Chapter 13.[55] It reaffirmed its previous decision in *Deans*, which endorsed the *Estus* factors. The *Neufeld* court stated that although the nondischargeability of a debt in Chapter 7 "is not, standing alone, a sufficient basis on which to find bad faith . . . it is a relevant factor to be considered in the § 1325(a)(3) good faith inquiry."[56] The court made little effort, however, to hide its feelings on the matter of dischargeability, going on to say:

> Resort to the more liberal discharge provisions of Chapter 13, though lawful in itself, may well signal an "abuse of the provisions, purpose, or spirit" of the Act, especially where a major portion of the claims sought to be discharged arises out of pre-petition fraud or other wrongful conduct and the debtor proposes only minimal repayment of these claims under the plan. Similarly, a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims.[57]

In *In re Smith*,[58] the Seventh Circuit acknowledged the existence of the 1984 amendment on disposable income, but this made no difference in the result. The debtor there had operated a home repair business which "fleeced senior citizens by making repairs which [the debtor] knew were not necessary."[59] The State of Indiana obtained judgment against him on behalf of homeowners, whereupon the debtor filed under Chapter 13. He listed the State as the holder of about half his unsecured debt. Although his plan applied projected three year disposable income to plan payments, unsecured debt received only a 2% dividend. The lower courts found the plan to have been filed in good faith. The Seventh Circuit reversed and remanded. It recognized that under the 1984 amendment good faith "does not require a specific amount or percentage of payments to unsecured creditors."[60] But it nevertheless affirmed the "totality of the circumstances" standard which it had previously enunciated in *Rimgale*. Without citation of authority, the court stated: "The definition of good faith has historically not been limited to the debtor's accurately disclosing all material information on his plan and intending to fulfill it, but also to [sic] the factors *Rimgale* sets out, including the 'debtor's motive in seeking Chapter 13 relief' and 'circumstances under which debts were incurred.' "[61]

In *Ohio v. Doersam (In re Doersam)*,[62] the debtor's plan proposed a 19% dividend on unsecured debt, mostly student loan debt which was nondischargeable in Chapter 7 unless its payment imposed an undue hardship on the debtor. The lower courts had denied confirmation, finding bad faith because of the proposed discharge of the student loan debt and because of the debtor's "questionable" budgeting of $400 as a monthly food expense for herself, her working daughter and her grandchild. The Sixth Circuit affirmed based on the *Estus* factors, with no recognition that many of these factors are now covered by the 1984 amendment on disposable income. The court did not, however, conceal the real reason for its decision. It said: "The bulk of [the debtor's] unsecured indebtedness consists of student loans which would not have been dischargeable under Chap-

---

55. *See id.* at 153.

56. *Id.* at 152.

57. *Id.* at 153.

58. 848 F.2d 813 (7th Cir.1988).

59. *Id.* at 814.

60. *Id.* at 820.

61. *Id.* at 821.

62. 849 F.2d 237 (6th Cir.1988).

ter 7. [The debtor] made absolutely no effort to repay these loans despite their long-term character, and despite the fact that they were instrumental in her securing a position paying approximately $24,000.00 per year." [63]

The debtor in *Solomon v. Cosby (In re Solomon)*[64] was a doctor who had been sued in state court by three former patients alleging sexual misconduct and claiming damages totaling $160 million. This is conduct which if proven would likely establish the debt as nondischargeable in Chapter 7 as debt resulting from willful and malicious injury to the person. The debtor filed under Chapter 13 before the state court suit went to trial. With no reference to the intervening 1984 amendment on disposable income, the court affirmed the "totality of the circumstances" standard set out in its prior decision in *Neufeld.* It reversed and remanded so the bankruptcy court could consider whether there had been an "abuse of the provisions, purpose, or spirit of Chapter 13," expressing its belief that a good faith inquiry encompasses examination of a debtor's prepetition conduct.[65]

The Third Circuit disagrees with this line of cases. It believes a good faith inquiry should not consider the debtor's prepetition conduct or the nondischargeability in Chapter 7 of debt included under a Chapter 13 plan. In *In re Lilley,*[66] the United States Secret Service, many years before, had seized the debtor's business assets in the mistaken belief he was a counterfeiter. Although the Service returned the assets when it discovered the mistake, the debtor's business ultimately failed, which he attributed to the seizure.

The debtor thereafter refused to pay his federal income taxes. When the tax debt mounted and legal efforts failed, he filed under Chapter 7. He was confronted with a bankruptcy court order declaring the tax debt nondischargeable as debt "resulting from willful tax evasion" within the meaning of section 523(a)(1)(C). The debt limits for eligibility under Chapter 13 had in the meantime been increased, so the debtor soon filed under that chapter. The district court dismissed the case because of the tax debt's nondischargeability in Chapter 7. The Fourth Circuit reversed because it believed the "totality of the circumstances" standard should be employed.[67] Significantly, however, the court rejected the factor concerning nondischargeability of debt in Chapter 7, saying it did so "[i]n light of *In re Gathright....* "[68] The decision in *In re Gathright*[69] is a thorough critique of case law employing the *Estus* factors or the totality of the circumstances standard. The court observed that factors having to do with the debtor's income, expenses and prior filings are inconsistent with Code provisions inserted in 1984, and the factor concerning Chapter 7 nondischargeability conflicts with the broad discharge expressly granted by section 1328(a).[70]

### Case Law on Multiple Filings

The bankruptcy court in the present case thought it bad faith for the Debtor to file his Chapter 13 petition after his Chapter 7 filing without experiencing any change of circumstances. The court stated: "The debtor has not incurred new debt nor is it foreseeable his income will be supplemented by a source other than that

---

63.   *Id.* at 240.

64.   67 F.3d 1128 (4th Cir.1995).

65.   *Id.* at 1134.

66.   91 F.3d 491 (3d Cir.1996).

67.   *See id.* at 496.

68.   *See id.* at 496 n. 2.

69.   67 B.R. 384 (Bankr.E.D.Pa.1986).

70.   *See also Nelson v. Easley (In re Easley),* 72 B.R. 948 (Bankr.M.D.Tenn.1987) (not bad faith for debtor to file chapter 7 case, convert case to Chapter 13 after debt is declared nondischargeable, and then propose to discharge same debt under Chapter 13).

of his house framing business" [footnote omitted].[71]

As has been seen, included among the *Estus* factors is "the frequency with which the debtor has sought relief under Bankruptcy Reform Act...."[72] Prior bankruptcy filings are also in the general mix of the "totality of the circumstances" standard.[73] The present case concerns a special category of successive filings, the filing of a Chapter 7 case which discharges all but section 523 nondischargeable debt, followed by the filing of a Chapter 13 case designed to handle the remaining debt. And the Chapter 13 filing here occurred while the Chapter 7 case remained open.

*Johnson v. Vanguard Holding Corp. (In re Johnson)*[74] is the only court of appeals decision where bad faith was alleged to be present solely because of multiple filings, there the filing of successive Chapter 13 cases. The lower courts had refused to confirm the debtor's Chapter 13 plan because they found bad faith present due to the debtor having commenced the case shortly after her prior Chapter 13 case was dismissed following defaults in plan payments. The Second Circuit rejected the contention that the two filings constituted bad faith *per se*. The court noted that nothing in the Code (as it then read) precluded repetitious filings. Observing that the debtor asserted she had lost her job since the first filing, the court remanded the case for the bankruptcy court to consider whether she had suffered a change in circumstances justifying her prior defaults and her second filing.

*Johnson* was handed down before the 1984 legislation. That legislation covered more than the topic of disposable income. It also dealt with multiple filings by adding Code section 109(f), now 109(g), which provides as follows:

(g) Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—

(1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or

(2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.[75]

In *Johnson v. Home State Bank*[76] the question before the Supreme Court was whether a debtor can include a mortgage lien in a Chapter 13 plan after the personal obligation secured by the lien has been discharged in a prior Chapter 7. The Court first concluded that such a mortgage lien is a "claim" subject to inclusion in a Chapter 13 plan.[77] It then dealt with the contention that even though a nonrecourse lien might normally be considered a claim, it should not be so considered when it is merely the remainder of an obligation for which the debtor's personal liability has been discharged in a prior Chapter 7 case. Serial filings under Chapters 7 and 13, the mortgagee asserted, evade the limits Congress intended to place on these remedies.[78] The Court noted the express filing prohibition contained in section 109(g). It also referred to section 727(a)(8) and section 727(a)(9), which place limits on successive discharges under Chapter 7. The Court believed that the absence of a like statutory prohibition against successive

---

71. Decision of September 22, 1998, p. 8.

72. *Estus*, 695 F.2d at 317.

73. *See, e.g., Neufeld*, 794 F.2d at 152.

74. 708 F.2d 865 (2d Cir.1983).

75. 11 U.S.C.S. § 109(g) (Law. Co-op. 1997).

76. 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

77. *See id.* at 82–87, 111 S.Ct. 2150.

78. *See id.* at 87, 111 S.Ct. 2150.

Chapter 7 and Chapter 13 filings indicates Congress did not wish to categorically foreclose the benefit of Chapter 13 to one who has previously received relief under Chapter 7.[79] The Court was careful to observe, however, that creditors have the benefit of all the various requirements for the confirmation of a Chapter 13 plan, including the provisions on best interests of creditors, disposable income, good faith and feasibility. The Court declined to deal with the issues of good faith and feasibility because the lower courts had not addressed them, leaving these questions for consideration on remand.[80]

Prior to the Court's decision in *Johnson v. Home State Bank*, courts of appeal had differed on whether a mortgage lien remaining after discharge of the underlying obligation in Chapter 7 is a "claim" subject to being dealt within a subsequent Chapter 13.[81] In two of these decisions, *In re Saylors*[82] and *In re Metz*,[83] it was also contended the Chapter 13 plan was not proposed in good faith. Both cases involved only mortgage debt, with no complication of nondischargeability under Chapter 7. In both, the bankruptcy court found good faith and the court of appeals left this undisturbed. Neither the *Saylors* nor *Metz* court could find any statutory prohi-

bition against the successive filings. In *Saylors* the district court had found bad faith as a matter of law because the debtor filed his Chapter 13 case while the Chapter 7 case remained open but after the discharge had entered. The court of appeals saw no bad faith in this. It recognized that for practical reasons there is often a delay in closing a Chapter 7 case. In its view, to prevent a debtor from filing a Chapter 13 petition during the period of delay collides with the intent of Congress to make Chapter 13 available to eligible debtors.[84] In upholding the bankruptcy court's decision, the *Saylors* court used the *Estus* factors and the *Metz* court employed the "totality of the circumstances" test.

The bankruptcy court in the present case thought it was indicative of bad faith that not only did the Debtor file a Chapter 13 case following a Chapter 7 filing, but also that he did so while the Chapter 7 case remained open, albeit after the Debtor's general Chapter 7 discharge had entered. Although not always treating the question in terms of good faith, courts have split on whether it is permissible for a debtor to file a new case while his prior case remains open.[85] Some courts permit the second filing if a discharge has not

---

79. *See id.*

80. *See id.* at 88, 111 S.Ct. 2150.

81. *Compare Home State Bank v. Johnson (In re Johnson),* 904 F.2d 563 (10th Cir.1990), *rev'd,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (lien not a "claim"), *with Jim Walter Homes, Inc. v. Saylors (In re Saylors),* 869 F.2d 1434 (11th Cir.1989), *and Downey Sav. & Loan Ass'n v. Metz (In re Metz),* 820 F.2d 1495 (9th Cir.1987) (lien a "claim").

82. 869 F.2d 1434 (11th Cir.1989).

83. 820 F.2d 1495 (9th Cir.1987).

84. *See Saylors,* 869 F.2d at 1438.

85. *See, e.g., Turner v. Citizens Nat'l Bank (In re Turner),* 207 B.R. 373 (2d Cir. BAP 1997) (leaving aside question of bad faith, filing of Chapter 13 case to obtain stay of foreclosure while prior Chapter 7 case remains open and no discharge has issued, rather than converting Chapter 7 case, creates cause for dismissal); *In re Cowan,* 235 B.R. 912 (Bankr. W.D.Mo.1999) (where chapter 7 trustee demanded car and to retain car debtor filed Chapter 13 while Chapter 7 case remained open but after chapter discharge had issued, second filing not cause for dismissal); *Norwalk Sav. Society v. Peia (In re Peia),* 204 B.R. 310 (Bankr.D.Conn.1996) (second filing, where discharge has previously entered, deemed a factor in inquiry on good faith); *In re Spectee Group, Inc.,* 185 B.R. 146 (Bankr. S.D.N.Y.1995) (same); *In re Aichler,* 182 B.R. 19 (Bankr.S.D.Tex.1995) (same); *In re Keen,* 121 B.R. 513 (Bankr.W.D.Ky.1990) (per se prohibition of second filing); *In re Bodine,* 113 B.R. 134 (Bankr.W.D.N.Y.1990) (same); *In re Heywood,* 39 B.R. 910 (Bankr.W.D.N.Y. 1984) (same).

issued in the first case.[86] They distinguish the Supreme Court's decision in *Freshman v. Atkins.*[87] There, the debtor's discharge in his first case was contested. The contest was still pending when he filed a second petition requesting a discharge of new debts as well as those included in his first petition. The lower courts had denied a discharge as to the old debts and granted it as to the new debts. The Supreme Court affirmed, stating: "Denial of a discharge from debts provable, or failure to apply for it within the statutory time, bars an application under a second proceeding for discharge from the same debts." [88]

A number of decisions deal with a more common problem—the filing of a Chapter 13 petition in order to discharge debt which was not dischargeable in the debtor's prior Chapter 7 case. Most look to the *Estus* factors or their equivalent, the "totality of the circumstances." But the nondischargeability of debt in Chapter 7 is obviously the factor which is most important to these courts. In *Pioneer Bank v. Rasmussen (In re Rasmussen),*[89] a decision cited by the bankruptcy court in the present case, the bankruptcy court had ruled that a $25,000 debt owed a bank was nondischargeable as a debt due to fraud. Some $75,000 of other unsecured debt was discharged. The debtor filed a Chapter 13 petition weeks after his Chapter 7 case was closed and proposed to pay a 1.5% dividend to the bank, then his only unsecured creditor. Finding good faith, the

bankruptcy court confirmed the plan. The district court affirmed, but the Tenth Circuit reversed. It referred to the eleven *Estus* factors, although it recognized the *Estus* circuit had modified those factors in light of the 1984 amendment.[90] Stating it was applying a standard of "totality of the circumstances," the court concluded that the plan had not been proposed in good faith. It said:

> We reach this conclusion because the Chapter 13 filing was a manipulation of the bankruptcy system in order to discharge a single debt for de minimus payments under a Chapter 13 plan which was ruled not dischargeable under an immediately previous Chapter 7 filing, when the debtor could not originally meet the jurisdictional requirements [as to debt limits] of Chapter 13.[91]

After *Rasmussen,* bankruptcy appellate panel decisions in the Tenth Circuit have gone both ways on similar facts, depending on the initial "finding" of the bankruptcy judge as to good faith.[92]

The bankruptcy court in the present case also cited *In re Cushman,*[93] which did not involve debt nondischargeable in Chapter 7. The debtor's problem there was a $15,845.17 claim owed Ford Motor Credit Company secured by her car. The discharge in the debtor's Chapter 7 case left her with only this lien. She soon filed a Chapter 13 petition, saying she had stopped making her car payments because of upcoming dental expenses.[94] Her Chapter 13 plan proposed to pay Ford $9,263,

---

**86.** *See, e.g., In re Cowan,* 235 B.R. 912 (Bankr.W.D.Mo.1999).

**87.** 269 U.S. 121, 46 S.Ct. 41, 70 L.Ed. 193 (1925).

**88.** *Id.* at 123, 46 S.Ct. 41.

**89.** 888 F.2d 703 (10th Cir.1989).

**90.** *See id.* at 704.

**91.** *Id.* at 706.

**92.** *Compare Davis v. Mather (In re Davis),* 239 B.R. 573 (10th Cir. BAP 1999) (bankruptcy

court finding of bad faith in case involving debt nondischargeable in prior Chapter 7 upheld as not clearly erroneous against contention that bankruptcy court considered only the factor relating to successive filings), *with Mason v. Young (In re Young),* 237 B.R. 791 (10th Cir. BAP 1999) (bankruptcy court's finding of good faith upheld as not clearly erroneous under totality of circumstances standard, notwithstanding presence of debt nondischargeable in prior Chapter 7).

**93.** 217 B.R. 470 (Bankr.E.D.Va.1998).

**94.** *See id.* at 473.

the value she placed on the car, over 48 months. Although no party claimed the debtor was not devoting all her disposable income to the plan (the Chapter 13 trustee recommended confirmation), the court voiced its doubts on this.[95] The court also believed she or her counsel had planned the subsequent filing of the Chapter 13 petition when she commenced her Chapter 7 case.[96] It made no mention of the effect of the 1984 legislation upon the *Estus*-type factors. Although conceding that a so-called "Chapter 20" case is not "prohibited *per se*," the court believed such a case is "not favored and must be closely scrutinized."[97] It set forth a list of factors which it thought were relevant to Chapter 20 cases. These factors were also referred to by the bankruptcy court below.[98] Most troubling to the *Cushman* court was the debtor's attempt "to accomplish through a chapter 20 what simply is not permitted in either chapter standing alone," namely, stripping down Ford's lien to its replacement value. The court was also concerned with the absence of any change in the debtor's circumstances between the two filings, as well as the zero payment to unsecured creditors (because none existed).[99] In light of all this, the court found bad faith.[100]

A "Chapter 20" case seems to have the best chance of success if it involves no question of Chapter 7 nondischargeability, no strip-down of a lien and no initial design on the part of the debtor to file both cases.[101] The presence of any one or more of these circumstances can be fatal to the debtor.[102] Some courts, however, are not troubled by a Chapter 13 case involving debt nondischargeable in Chapter 7. In *In re Dickerson*[103] the court observed that under *Johnson v. Home State Bank* there is no categorical bar to successive filings. The court saw nothing wrong with the debtor taking advantage of the broader discharge available in Chapter 13.[104] The vague parameters of the "totality of the circumstances" standard, which was controlling under circuit precedent, allowed the court to find good faith by considering such matters as the debtor's conservative life style.

## IV. CONCLUSION

The conclusion from all this seems inescapable. The meaning of the term "good faith" has gone far afield from that intended by the drafters of the Bankruptcy Code. Applying individualized standards of moralistic decision-making reserved only for Congress, many courts have interpreted "good faith" to mean fairness to creditors as determined by the court. But fairness is a relative term, and there is no evidence that Congress intended that

---

95. *See id.* at 473–74, 477–78.

96. *See id.* at 473.

97. *Id.* at 476.

98. These are:
   1. The proximity in time of the chapter 13 filing to the chapter 7 filing.
   2. Whether the debtor has incurred some change in circumstances between the filings that suggests a second filing was appropriate and that the debtor will be able to comply with the terms of a chapter 13 plan.
   3. Whether the two filings accomplish a result that is not permitted in either chapter standing alone.
   4. Whether the two filings treat creditors in a fundamentally fair and equitable manner or whether they are rather an attempt to manipulate the bankruptcy system or are an abuse of the purpose and spirit of the Bankruptcy Code.

99. *See Cushman,* 217 B.R. at 479.

100. *See also In re Craig,* 222 B.R. 266 (Bankr. E.D.Va.1998) (finding bad faith in strip-down Chapter 20 case for similar reasons).

101. *See, e.g., In re Waters,* 227 B.R. 784 (Bankr.W.D.Va.1998) (finding good faith).

102. *See, e.g., In re Jahnke,* 146 B.R. 830 (Bankr.E.D.Cal.1992) (bad faith found based on zero payment on claim ruled nondischargeable in prior Chapter 7 case).

103. 232 B.R. 894 (Bankr.E.D.Tex.1999).

104. *See id.* at 897.

courts apply such a fairness standard to each Chapter 13 plan. To the contrary, as pointed out by the writers,[105] many of the factors employed in the case law have been preempted by contrary judgments explicitly made by Congress.

■ We begin with basics. The meaning of good faith is simple honesty of purpose. This is the phrase's common English meaning. It is also how the phrase is used in commercial law. And, if there can be any doubt that this was its meaning intended by Congress when it passed the Code, that doubt is resolved by examination of decisions under the prior Act. In applying the same good faith requirement under the prior Act, courts looked only to the honesty of the debtor's postfiling conduct. They did not concern themselves with the debtor's prefiling conduct or the "purpose or spirit" of bankruptcy law. If Congress intended to change this pre-Code approach, we must presume Congress would have expressed that intent.[106]

■ The contrary view of good faith, so prevalent in the case law, is blatantly inconsistent with a debtor's clear statutory rights. Section 1328 expressly grants a debtor a discharge even if the debts result from conduct such as fraud and hence are nondischargeable in Chapter 7. Section 1325 expressly requires a debtor only to devote all projected three year disposable income to the plan and provide creditors with at least what they would get in Chapter 7. And the Code contains no prohibition against the debtor filing a Chapter 13

petition after a Chapter 7 case, not even a prohibition against filing while the Chapter 7 case remains open.

No theory of statutory interpretation, not the textualist school, not the intentionalist school nor any other, supports a contrary reading of these Code sections. The *Estus* line of decisions represents pure judicial legislation. One might disagree with the policy choices made by Congress in permitting a broad discharge under Chapter 13, or in placing only limited restrictions on successive filings. But those choices having been made and clearly expressed, courts are bound to enforce them. Any contrary interpretation would establish nonstatutory eligibility requirements for Chapter 13.[107]

This case is reminiscent of what was before the Supreme Court in *Toibb v. Radloff*.[108] The debtor there was an unemployed consultant who had converted his Chapter 7 case to Chapter 11. It was contended that to qualify for relief under Chapter 11 a debtor must have business operations. Apparently divining the "spirit" of Chapter 11, some courts had so held.[109] But the Supreme Court found no provision in the Code requiring the presence of a business for eligibility under Chapter 11. It noted the availability of Chapter 11 to a "person."[110] It regarded the "plain language" of the statute as compelling.[111] References in legislative history to debtors engaged in business were unpersuasive to the Court. It believed

---

**105.** *See* 8 Lawrence P. King, et al., Collier on Bankruptcy ¶ 1325.04 (15th ed. rev.1999); 1 Keith M. Lundin, Chapter 13 Bankruptcy §§ 5.14–5.18 (1992); Bradley M. Elbein, *The Hole in the Code: Good Faith and Morality in Chapter 13*, 34 San Diego L.Rev 439 (1997); Ellen M. Horn, *Good Faith and Chapter 13 Discharge: How Much Discretion is Too Much?*, 11 Cardozo L.Rev. 657 (1990).

**106.** *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

**107.** Indeed, the identical standard is also employed to determine whether a Chapter 13

case should be dismissed for a bad faith filing. *See, e.g., In re Love*, 957 F.2d 1350 (7th Cir. 1992) (applying standard of "totality of the circumstances").

**108.** 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991).

**109.** *See, e.g., Wamsganz v. Boatmen's Bank*, 804 F.2d 503 (8th Cir.1986).

**110.** *See Toibb*, 501 U.S. at 160–61, 111 S.Ct. 2197.

**111.** *See id.* at 160, 111 S.Ct. 2197.

these reflected no more than a congressional expectation that parties engaged in business would constitute the bulk of Chapter 11 debtors.[112] Much the same can be said of the reference in the Code's legislative history to the bankruptcy policy favoring a fresh start for the "honest" debtor, a reference which has been seized upon by some courts to deny Chapter 13 relief for a debtor guilty of prefiling misconduct.[113]

The decisions finding bad faith from circumstances such as those present in this case do so in a fashion which attempts to obscure their true basis, usually disapproval of the debtor's conduct which created the debt. Courts use the *Estus* factors as a screen for their real rationale. And they call the good faith issue a question of fact. They employ the clearly erroneous rule to affirm or reverse, whichever is consistent with their notion of the desirable result.[114] But matters such as the scope of a discharge or the minimum permissible dividend do not involve factual issues. They concern legal rights.

There is a further defect in the standard consisting of the *Estus* factors. In employing diverse factors and permitting a court to rely upon any one or more of the factors, the standard provides little guid-

**112.** Courts continue, however, to dismiss Chapter 11 cases as bad faith filings if the debtor has no on-going business operations. *See, e.g., In re Double W Enters., Inc.,* 240 B.R. 450 (Bankr.M.D.Fla.1999).

**113.** *See, e.g., Handeen v. LeMaire (In re LeMaire),* 898 F.2d 1346, 1352 (8th Cir.1990).

**114.** Perhaps the most striking example of this misuse of the clearly erroneous rule is the Eighth Circuit's *en banc* decision in *In re LeMaire,* 898 F.2d 1346 (8th Cir.1990), which vacated a previous decision by a divided panel of the same court, *Handeen v. LeMaire (In re LeMaire ),* 883 F.2d 1373 (8th Cir.1989). The debtor's Chapter 13 filing, his only filing, was prompted by a $50,000 civil judgment resulting from conduct for which he was criminally convicted of aggravated assault. The debtor's plan proposed to pay the judgment, and other unsecured debt, through $500 monthly installments over five years, which amounted to a dividend of 42.3%. The bankruptcy court examined the *Estus* factors and, in light of the broad discharge available under section 1328, found the plan to be proposed in good faith. It observed that the debtor had served a criminal sentence, was getting back on his feet professionally and financially, and was entitled to a fresh start, the cornerstone of bankruptcy law. In the panel decision, a majority of the panel believed the bankruptcy court's "factual findings support its conclusion that [the debtor's] proposed plan was not an abuse of the bankruptcy laws." 883 F.2d at 1380.

The *en banc* court disagreed. Although recognizing that the 1984 legislation on disposable income had modified the process of determining good faith, the court believed there was still "preserved the traditional 'totality of circumstances' approach with respect to the *Estus* factors not addressed by legislative amendments." 898 F.2d at 1349. The court acknowledged that the bankruptcy court had examined in detail each of the eleven *Estus* factors. But the court expressed particular concern about two of these factors—the nondischargeability of the debt in Chapter 7 and the debtor's "motivation and sincerity in seeking Chapter 13 relief." *Id.* at 1350. The court observed that in evaluating the debtor's motivation and sincerity the bankruptcy court had balanced the victim's desire for compensation against the debtor's desire for a fresh start, and had found the latter to outweigh the former. The court thought this analysis "fails to properly consider the strong public policy factors, inherent in the Bankruptcy Code, which are implicated in discharging this debt and gives undue emphasis to the fact that the statutory terms governing Chapter 13 petitions do not expressly make a debt resulting from a willful and malicious injury nondischargeable." *Id.* at 1351. It concluded the bankruptcy court's finding of good faith "was clearly erroneous because the evidence before the court regarding [the debtor's] good faith was so 'implausible on its face that a reasonable factfinder would not credit it.'" *Id.* The court denied that its decision rested on policy grounds alone. *See id.* at 1352. It believed the decision to be consistent with the bankruptcy policy favoring a fresh start for the "honest" debtor. *Id.* Three dissenters correctly asserted the court was actually holding, under the guise of the clearly erroneous rule, that a plan proposing payment on debt resulting from a heinous crime is not, as a matter of law, proposed in good faith. *See id.* at 1354. The dissenters observed that section 1325 requires only that the plan be proposed in good faith, not that the debt be incurred in good faith.

ance, as has been observed.[115] One court has described working under the *Estus* standard this way: "The trick seems to be in not placing too much weight on any single factor, but in the court's looking at how a number of factors in any given case operate together to betray a plan proposed in bad faith."[116] The public and the bar deserve something better then this leger-demain. To the extent the nature of a question allows, the rule of law should be a law of clear rules.[117]

■ It was error for the bankruptcy judge here to take a jaundiced view of the Debtor's second filing because it was made while the prior Chapter 7 case remained open. The Code contains no mandate against such a second filing. There is no indication in the record, moreover, that at the time of the Chapter 13 filing property claimed as property of the Chapter 13 estate was still property of the Chapter 7 estate. And, as we have seen, many courts permit such a filing if it is made after the discharge enters in the prior case, which is our situation. There is no question here, as there was in *Freshman v. Atkins*,[118] of a debtor attempting to relit-igate in his second filing a pending contest over the discharge of debts included in his first filing. As we have also seen, some courts, like the bankruptcy court here, re-quire a change in circumstances to justify the second filing. Such a requirement sat-isfies the concern that a debtor have an honesty of purpose in filing the second case. The Debtor here did have a change in circumstances, although the bankruptcy court thought otherwise. In fact, he had two changes of circumstances between the

first and the second filing. Kuzniar was about to have the sheriff sell the Debtor's home. And the Kuzniar debt had been declared nondischargeable under section 523(a)(2)(A). There is therefore no lack of good faith because of this second filing even under an expansive view of good faith. Moreover, the Debtor did his best to avoid the second filing by attempting to convert the Chapter 7 case to Chapter 13. His second filing is thus quite different from the situation where a debtor files a second time in order to obtain reimposition of the automatic stay after having unsuc-cessfully opposed a lifting of the stay in the prior case.[119]

■ It was also error for the bank-ruptcy judge here to see bad faith in the Debtor's Chapter 13 plan because it prom-ised creditors less than what the bankrupt-cy judge thought they deserved on account of the Debtor's prefiling conduct. In Sec-tion 1325, Congress set the minimum divi-dend by employing the disposable income and the best interests tests. Congress having spoken, no judge may raise the bar.

■ And it was error for the bank-ruptcy judge to treat as an indicator of bad faith the proposed discharge of debt which was nondischargeable in the Debtor's Chapter 7 case. Congress has spoken clearly in Section 1328 by providing for the discharge of debt deemed not dischargea-ble in Chapter 7. No judge may override Congress's decision to do so, regardless of the judge's distaste in participating in the discharge of a debt immorally incurred. Right and wrong are the province of

---

**115.** *See* Richard E. Coulson & Alvin C. Har-rell, *1995 Consumer Bankruptcy Develop-ments,* 51 Bus.Law. 957, 967 (1996) (standard of "totality of circumstances" provides little meaningful guidance).

**116.** *In re McLaughlin,* 217 B.R. 772, 775–76 (Bankr.W.D.Tex.1998).

**117.** *See, e.g.,* Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U.Chi.L.Rev. 1175 (1989) (criticing "totality of the circum-

stances" as legal standard in various con-texts).

**118.** 269 U.S. 121, 46 S.Ct. 41, 70 L.Ed. 193 (1925).

**119.** *See, e.g., Turner v. Citizens Nat'l Bank (In re Turner),* 207 B.R. 373 (2d Cir. BAP 1997) (finding cause for dismissal of second filing where purpose of filing was reimposition of stay whose lifting debtor had unsuccessfully opposed in first case).

judges, but only within the parameters set by the legislative branch.

We do not hold today that an examination of the surrounding circumstances is inappropriate in determining whether a debtor has met the good faith requirement of section 1325. Even the simplistic word "honesty" can be elastic in its perception and application, subsuming as it does the elusive element of "intent" which can be judged only by examining surrounding circumstances such as the debtor's candor with creditors and the court. But we do say that courts must be very careful not to allow the freedom of such an examination to seduce them into a moralistic override of Congress' determinations. A review of the surrounding circumstances should and must be limited to an examination of only those circumstances which are *relevant*. The impact of the debtor's prefiling conduct upon the dischargeability of debt had the case been filed under Chapter 7 is not a factor which is relevant to good faith. Nor is the filing of a Chapter 13 case after a prior Chapter 7 case and following a change of circumstances, such as a change in the debtor's financial circumstances or a ruling of non-dischargeability in the Chapter 7 case.

Here, the bankruptcy judge wove impermissible considerations into his findings. We are inclined to say that, absent those considerations, there is no remaining obstacle to confirmation. Yet, the record is not sufficiently clear for us to make that determination. We therefore VACATE the bankruptcy court's order denying confirmation of the Debtor's plan and REMAND the case to that court for further proceedings consistent with this decision.

**SO ORDERED.**